UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PAUL L. MATYA,

_____Plaintiff,

        -vs-                                97-CV-763C

THE DEXTER CORPORATION,

                          Defendant.

_____

APPEARANCES:         BURGETT & ROBBINS (ROBERT A. LIEBERS, ESQ),
Jamestown, New York, for Plaintiff

BOND, SCHOENECK & KING, PLLC (DANIEL P.
FORSYTH, ESQ. and SUBHASH VISWANATHAN, ESQ.),
Buffalo, New York, for Defendant.

## INTRODUCTION

Plaintiff brought this employment discrimination case on September 30, 1997, alleging causes of action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.,* the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.,* the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.,* and the New York State Human Rights Law, N.Y.Exec. Law § 290, *et seq.* ("NYSHRL"). Item 1. Plaintiff was employed by the defendant corporation[1] from September 1979 until his discharge in January 1996.

_____

[1] On or about August 23, 1999, Loctite Corporation acquired all the assets and liabilities of the Dexter Corporation Electronics Materials Division. Dexter has since ceased to exist as an independent ongoing business entity. Item 48.

Following a bankruptcy proceeding and a change in plaintiff's counsel, the parties stipulated that plaintiff's age discrimination claims under the ADEA and NYSHRL were permanently withdrawn with prejudice.  Item 58.  On September 29, 2003, defendant moved for summary judgment dismissing the complaint.  Item 66.  Plaintiff filed his response on January 7, 2004.  Item 74.  Thereafter, on February 19, 2004, plaintiff filed a motion for an adverse inference.  Item 83.  He argued that defendant failed to preserve evidence that was relevant to his ADA claim–specifically, evidence of plaintiff's interviews with an industrial psychologist.

Plaintiff also filed a motion to amend the complaint on March 19, 2004.  Item 88. He sought to "clarify the plaintiff's claims based on the facts that have arisen during the lengthy period of discovery."  Item 88, Liebers Affidavit, ¶ 4.  On April 2, 2004, defendant filed a response to plaintiff's motions (Items 92, 93) and a reply in support of its motion for summary judgment.  Item 91.  On April 28, 2004, plaintiff filed a surreply memorandum of law in opposition to the motion for summary judgment (Item 100) and a memorandum of law in support of his motion for an adverse inference.  Item 101.  Oral argument was heard on May 25, 2005.  Thereafter, plaintiff filed a letter brief on October 12, 2005.  Item 108. The court allowed defendant an opportunity to respond, and it filed a supplemental memorandum of law on November 18, 2005.  Item 111.  For the reasons that follow, the defendant's motion for summary judgment is GRANTED, the plaintiff's motion for an adverse inference is DENIED, plaintiff's motion to amend the complaint is DENIED, and the complaint is dismissed.

**FACTS**[2]

Plaintiff began his employment with defendant Dexter Corporation on September 17, 1979.  Item 67, Exh. C, Deposition of Paul Matya ("Matya Dep."), p. 8.  In May 1993, plaintiff held the position of Director of Finance, Electronic Packaging Products ("EEP"), in the company's Olean, New York, facility, and was responsible for coordinating financial reporting for EEP locations worldwide.  *Id.,* p. 463.  From 1989 until 1995, plaintiff reported directly to Dick Jensen, Vice President and General Manager of the EEP sub-group.  *Id.,* p. 158; Item 67, Exh. D, Deposition of Richard Jensen ("Jensen Dep."), p. 7.  In late 1995, Jon Kirk replaced Jensen as Vice President of EEP, and plaintiff began reporting to Kirk.  Matya Dep., pp. 80-81.  Plaintiff also had an indirect reporting relationship with Chuck Sharp, Vice President of Finance for Dexter Electronic Materials Division ("DEM"), of which EEP was a sub-group.  Jensen Dep., pp. 7-8.  Ron Benham was the President of DEM.  Jensen Dep., p. 138.

From 1992 until 1996, plaintiff suffered a series of personal problems.  In October 1992, plaintiff's sister died after several months of hospitalization.  Matya Deposition, pp. 141-43.  In March 1993, plaintiff's mother died.  *Id.,* p. 145.  In October 1993, plaintiff and his wife separated and ultimately were divorced in May 1995.  *Id.,* pp. 148-50.  In November 1993, plaintiff's son was involved in a motor vehicle accident which resulted in the death of a pedestrian.  A lawsuit was brought against both plaintiff and his son, which went to trial in 1996.  *Id.,* pp. 151-54.  In October 1994, criminal proceedings were brought against plaintiff's youngest son for an assault against a foreign exchange student.  *Id.,*

---

[2] This factual statement is taken from the papers in support of and in opposition to the defendant's motion for summary judgment and the plaintiff's motion for an adverse inference.

pp. 155-56.  Plaintiff's superiors, including Dick Jensen, Chuck Sharp, and Ron Benham, were aware of these circumstances, and plaintiff was always given adequate time off to deal with these problems.  *Id.,* pp. 160-65.

By plaintiff's own admission, his personal problems made him negative, irritable, and distracted.  Matya Dep., p. 184.   In a memorandum to Jensen in October 1993, plaintiff was critical of Sharp, complaining that Sharp "is not in touch with the reality of what we do, what our needs are, or what's best for the business."  Item 67, Exh. 31.  In June 1994, plaintiff's performance evaluation was satisfactory, yet Jensen wrote that plaintiff "had some conflicts/disagreements with division finance" and suggested seminars to help "deal with people and personnel situations."  Item 67, Exh. 16.  In his May 1995 performance evaluation, plaintiff was given ratings of less than competent in nine categories, including the ability to meet commitments on schedule, manage conflict effectively, and solicit, listen, and respond to the opinions of others.  *Id.,* Exh. 18.  At that time, Jensen noted that plaintiff displayed a negative attitude toward people and functions outside of the Olean facility, and that some working relationships had been strained.   *Id.*  In May 1995, Jensen counseled plaintiff regarding plaintiff's criticism of his superiors, and advised him to show a more supportive and cooperative attitude.  Item 67, Exh. 125.  This performance evaluation was below average, yet plaintiff nonetheless was given a $4,000 raise.  Jensen Dep., p. 70.  Jensen explained that the performance evaluation was intended to help plaintiff "correct any problems that he had or any deficiencies, and . . .  not intended to be punitive . . . ."  Jensen Dep., p. 71.

In November 1995, plaintiff was informed by Dick Jensen in a memorandum that his performance had not improved.  Item 67, Exh. 26.  Specifically, plaintiff was advised that

he had failed to complete a working capital reduction plan for EEP and monthly reports for Chuck Sharp. Jensen also said that plaintiff's criticism of coworkers and management was undermining his credibility and compromising his effectiveness. *Id.* Plaintiff was viewed as difficult to work with and not a team player, and was told that he was portraying "a cynical, negative and analytically superficial point of view." *Id.* Additionally, Jensen informed plaintiff that his executive compensation bonus rate had been reduced as a result of his performance problems. *Id.;* Jensen Dep., p. 84. In order to remedy the situation and protect his position, plaintiff was asked to prepare an action plan describing how he intended to complete his tasks and change his operating style, including a plan to accomplish certain tasks required of him by Chuck Sharp. *Id.* The deadline for the action plan was extended from November 24 until December 1, 1995, because plaintiff was scheduled to undergo carpal tunnel surgery on his right hand. Matya Dep., pp. 536-37.

Kirk approved the plan on November 30, 1995, and Jensen approved the plan on December 1, 1995. Matya Dep., pp. 536-38. Plaintiff's proposed action plan, which included recommendations for re-engineering the finance function, was then reviewed by Sharp, who found the plan inadequate and superficial. Item 67, Exh. E, Deposition of Charles Sharp ("Sharp Dep."), pp. 98-99. Plaintiff was asked for a revised plan by January 5, 1996, but the deadline was extended until January 13, 1996 at plaintiff's request because he was scheduled to undergo carpal tunnel surgery on his left hand. Matya Dep., p. 540. Plaintiff did not submit a revised action plan at any time prior to his discharge. Matya Dep., p. 589.

As part of his general responsibilities, plaintiff was required to assist in preparing a quarterly forecast of EEP's financial performance, known as the 5Q forecast. Matya Dep.,

5

pp. 608-09.  The EEP 5Q forecast was used by Sharp in preparing a 5Q forecast for DEM.

Sharp Dep., pp. 112-13.  In January 1996, Sharp realized that DEM's actual sales during

1995 were approximately $1.1 million short of projected sales, and thus earnings were

approximately $900,000 short of the projected earnings set forth in the December 1995 5Q

forecast for DEM.  Sharp Dep., pp. 110-11.  This inaccurate projection resulted in a drop

in Dexter's stock price.  Jensen Dep., pp. 145-46; Item 67, Exh. F, Deposition of Ronald

Benham ("Benham Dep."), pp. 47-49.  Benham made the decision to discharge both

plaintiff and Sharp, as he felt they were responsible for the inaccurate 5Q forecast and had

become unable to work together.  He also felt that he needed to make an immediate

change and could not wait for plaintiff to execute his action plan.  Benham Dep., pp. 65-67.

Plaintiff was informed of his discharge on January 22, 1996.  Matya Dep., p.  8.

Prior to his discharge, on January 5, 1996, plaintiff received notification from the

human resources director that William Plasse, an industrial psychologist, would be in Olean

in late January.  Item 83, Exh. 2, ¶ 7.  Dr. Plasse was a consultant used by defendant as

a resource for "management personnel for career development."  *Id.,* ¶ 8.  Plaintiff

scheduled an appointment with Dr. Plasse for January 23, 1996, intending to discuss his

action plan, but was discharged on January 22, 1996.  *Id.,* ¶¶ 10-11.  Dr. Plasse, now

retired, stated in an affidavit that he first met with plaintiff on November 15, 1984.  Item 83,

Exh. 1, ¶ 5.  While he believes he met with plaintiff on further occasions after that, Dr.

Plasse stated that he has no records of those meetings.  *Id.*  Dr. Plasse further stated that

on those occasions he met with Dexter employees, he prepared a report, reviewed his

report with the employee, and sent a copy to the Vice President of the division in which the

employee worked.  *Id.,* ¶ 6.  Dr. Plasse stated that his primary purpose was to help with

6

"career and individual development."  *Id.*   Plaintiff stated that he met with Dr. Plasse approximately six times during the course of his career at Dexter for purposes of "career development assessment."  Matya Dep., p. 200.  Plaintiff sought reports from Dr. Plasse as part of his discovery requests, but defendant was unable to locate or produce any reports other than a report regarding plaintiff from 1986.  *Id.,* Exh. 7.

In April 1995, plaintiff was referred to Margaret Balacki, a nurse practitioner in psychiatry, through the Employee Assistance Program at Dexter.  Item 77, ¶¶ 4, 7.  Plaintiff first saw Ms. Balacki on April 20, 1995.  *Id.,* ¶ 8.  Ms. Balacki concluded that plaintiff was clinically depressed, and requested a prescription for Zoloft, an anti-depressant medication.  *Id.,* ¶¶ 9-10.  Ms. Balacki saw plaintiff on April 27, May 11, and June 13, 1995, and again on January 30, 1996, after he was discharged from his employment.  *Id.,* ¶ 11.

Plaintiff admitted that he did not inform his superiors that he had been diagnosed with and was being treated for depression because he did not want to appear weak.  Matya Dep., pp. 177, 180-83, 196.  Plaintiff states that his superiors should have noticed the changes in him and realized that he was suffering from a mental impairment.  Matya Dep., pp. 187-88.  Plaintiff never asked for an accommodation from his superiors to assist him in dealing with his mental impairment.  Matya Dep., p. 191.

Bernard Morris, Human Resources Manager for Dexter Corporation at the Olean location, stated in an affidavit that plaintiff was offered a severance package upon his discharge which required the signing of a release.  Plaintiff refused to sign the release and was denied the benefits of the severance package, including outplacement counseling.  Item 75, ¶ 13.

## DISCUSSION

**1. Motion for Summary Judgment**

The standard of review on a motion for summary judgment is well established. Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The burden of establishing the absence of a genuine factual dispute rests on the party seeking summary judgment. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir. 1994). The movant may discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case on an issue on which the non-movant has the burden of proof. *See Celotex,* 477 U.S. at 323.

If the moving party meets its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Rattner v. Netburn,* 930 F.3d 204, 209 (2d Cir. 1991). The nonmoving party may not rest upon unsubstantiated allegations, conclusory

assertions, or mere denials, but must set forth and establish specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue requiring trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584 (1986).  If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.  *Chambers,* 43 F.3d at 37.

### A.  Plaintiff's ADA and NYSHRL Claims

ADA and NYSHRL claims  are governed by the three-part analytical framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See  Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48-49 (2d Cir.), *cert. denied,* 537 U.S. 813 (2002) (*McDonnell Douglas* applied to ADA); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n.1 (2d Cir. 2000) (*McDonnell Douglas* applied to NYSHRL).  Under the *McDonnell Douglas* standard, a plaintiff bears the burden of proof and must ultimately establish, by a preponderance of the evidence:  (1) membership in a protected group; (2) qualification for a position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997).

Requirements for establishing a *prima facie* case are minimal.  *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema N.A,* 534 U.S. 506 (2002); *see also Fisher v. Vassar College,* 114

F.3d 1332, 1335 (2d Cir. 1997).  If a plaintiff is successful in demonstrating a *prima facie* case of disability discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory purpose for its adverse employment action.  *Austin v. Ford Models, Inc.,* 149 F.3d at 153 (citing *McDonnell Douglas*, 411 U.S. at 802).  The Second Circuit has held that "[a]ny such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision."  *Id.*  Once the employer satisfies its burden, a plaintiff may prevail only if he presents evidence that the employer's proffered reasons are a pretext for discrimination.  *Id.* To demonstrate pretext, plaintiff must show both that the proffered reason was false and that discrimination was the real reason.  *Id.*

The ADA prohibits discrimination in the hiring, advancement, or discharge of an otherwise qualified employee because of such individual's disability. *Cavallaro v. Corning Inc.*, 93 F. Supp. 2d 334 (W.D.N.Y. 2000); 42 U.S.C. § 12112(a).

> To establish a *prima facie* case of disability discrimination, a plaintiff must show:
>
> (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered [an] adverse employment action because of his disability.

*Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003), quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2003);  *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 149-50 (2d Cir.  1998)*; Cavallaro*, 93 F. Supp. 2d at 342.

"Under the ADA a 'disability' is: 'A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; B) a record of such an impairment; or C) being regarded as having such an impairment." *Kotlowski v. Eastman Kodak Co.*, 922 F. Supp. 790, 797 (W.D.N.Y. 1996), quoting 42 U.S.C. § 12102(2). "A physical impairment . . . , standing alone, does not necessarily constitute a disability under the ADA," since an impairment "'may affect an individual's life without becoming disabling.'" *Cavallaro*, 93 F. Supp. 2d at 343 (quoting *Hazeldine v. Beverage Media, Ltd.*, 954 F.Supp. 697, 703 (S.D.N.Y. 1997)). Therefore, plaintiff must demonstrate that the impairment "substantially limits" one or more of his "major life activities." *Id.*; *see also Toyota Motor Mfg., Kentucky, Inc., v. Williams,* 534 U.S. 184, 195 (2002); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998); 42 U.S.C. §12102(2).

For purposes of the ADA, major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(l). "Substantially limits" means that an individual is:  1) unable to perform a major life activity that the average person in the general population can perform; or 2) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). In assessing whether a plaintiff has a disability for purposes of the ADA, courts have been careful to distinguish impairments "which merely *affect* major life activities from those that *substantially limit* those activities." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d at 870. Thus, not any limitation, but only a

"substantial" limitation of a "major" life activity will constitute a disability within the meaning of the statute.  *See Ryan*, 135 F.3d at 870; *see also Knapp v. Northwestern Univ.*, 101 F.3d 473, 481 (7th Cir. 1996) ("Not every impairment that affects an individual's major life activities is a substantially limiting impairment."), *cert. denied,* 520 U.S. 1274 (1997).

Here, plaintiff has failed to sustain his burden of establishing a *prima facie* case of discrimination under the ADA as he has not shown that either his depression or his carpal tunnel syndrome constitutes a disability that substantially limits a major life function.  In opposition to the motion, plaintiff did not argue that his carpal tunnel syndrome substantially limited a major life activity, and there is nothing in the record that would indicate a substantial limitation of any major life activity by virtue of carpal tunnel syndrome. At oral argument, plaintiff conceded that his ADA claim is based on depression alone.

In his deposition, plaintiff stated that his depression substantially limited his ability to think, concentrate, work, and interact with others.  Matya Dep., pp. 711-14.  To establish a substantial limitation in the major life activity of working, plaintiff must show that his impairment places a significant restriction on his ability to perform either an entire class of jobs or a broad range of jobs in various classes as compared to the average person with comparable training and ability. 29 C.F.R. § 1630.2(j).  While plaintiff admitted that his depression had a negative impact on his job performance, he was nonetheless able to work, and stated in his complaint that he "effectively performed all the primary requirements of his position."  Item 1, ¶ 45.  In an affidavit submitted in opposition to the motion for summary judgment, plaintiff stated that in spite of the pressure to complete his action plan at the end of 1995, "I continued to do my job well and completed the audit in a satisfactory manner and addressed whatever issues needed to be addressed."  Item 79,

12

¶ 14.  Thus, plaintiff has not shown that he was unable to perform the functions of his position.  Moreover, plaintiff has not established that he was unable to perform a broad range of jobs.  Accordingly, he has not shown that his depression substantially limited the major life activity of working.

To the extent that plaintiff contends his depression interfered with the activities of thinking, sleeping, concentrating, or maintaining interpersonal relationships, plaintiff has failed to establish that any of these activities were substantially limited by his depression.  In her affidavit, Ms. Balacki stated that in April 1995, plaintiff reported feelings of "guilt, anger, worthlessness, . . . lack of appetite, a failing memory, a lack of concentration and fatigue."  Item 77, ¶ 12.  However, there is no proof in the record beyond mere allegations that plaintiff was substantially limited in the performance of any major life activities in comparison to an average person.  Given plaintiff's stated ability to perform his job, his alleged inability to concentrate does not evince a significant restriction on plaintiff's ability to think.  *See Baerga v. Hospital For Special Surgery*, 2003 WL 22251294, *6 (S.D.N.Y. September 30, 2003) (plaintiff's satisfactory performance review contradicted allegations that he was unable to think).  Additionally, while plaintiff was criticized by his superiors for his negative attitude and failure to be a "team player," mere trouble getting along with coworkers is not sufficient to show a substantial limitation in the activity of interacting with others.  *See  Zale v. Sikorsky Aircraft Corp.*, 2000 WL 306943, * 5 (D.Conn. February 7, 2000).  In contrast, plaintiff stated that he maintained relationships with coworkers, friends, and family (Matya Dep., pp. 18-21), and thus was not substantially limited in his ability to interact with others.  Finally, there is nothing in the record to show that plaintiff was substantially limited in his ability to sleep.  It has been recognized that difficulty sleeping

13

is a common problem, and the mere allegation that plaintiff had difficulty sleeping is not sufficient to show a substantial limitation in the major life activity of sleeping.  *See Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 644 (2d Cir. 1998), *cert. denied,* 526 U.S. 1018 (1999).   Accordingly, the court finds that plaintiff has not shown that his depression substantially limited any major life activity, and thus he was not disabled for purposes of the ADA.

Turning to plaintiff's claim under the NYSHRL, New York Executive Law § 296 makes it an unlawful discriminatory practice for an employer or licensing agency, because of the age, race, creed, color, national origin, sex, disability, genetic predisposition, or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment.   N.Y. Exec. Law § 296(1)(A).   Under the NYSHRL, a disability is defined in part as: "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . . ."   N.Y. Exec. Law § 292(21).   Thus, under state law, a disability need only be a demonstrable impairment; it does not have to substantially limit a major life activity.  *See Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d at 154.

Even assuming that plaintiff has established a disability for purposes of the NYSHRL, he has failed to show that he was discharged because of his disability.[3]  Plaintiff has offered no proof that his discharge was in any way motivated by his depression.  It is undisputed that none of plaintiff's supervisors knew that plaintiff had been diagnosed with and was being treated for depression.  Matya Dep., pp. 177-83; Jensen Dep., pp. 15-17; Sharp Dep., pp. 16-18; Benham Dep., pp. 8-13.  Plaintiff stated that he purposely kept his diagnosis and treatment from his superiors because he did not want to appear weak.  Matya Dep., pp. 195-96.

At the very least, for a plaintiff to show that he suffered an adverse employment action because of his disability, the employer must have knowledge of the alleged disability.  *See Kolivas v. Credit Agricole*, 1996 WL 684167 (S.D.N.Y. November 26, 1996), *aff'd,* 125 F.3d 844 (2d Cir. 1997) (summary judgment granted to employer where decision to terminate plaintiff was made before supervisor was aware of plaintiff's depression).  Plaintiff argues that his supervisors were aware of his personal problems and a change in his behavior at work and thus should have inferred that he was suffering from depression.  However, the ADA does not require "clairvoyance" on the part of the employer.  *See Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) (if an employer discharged the plaintiff without having knowledge of plaintiff's disability, ADA claim cannot succeed); *Pace v. Paris Maint. Co.*, 107 F. Supp. 2d 251, 262 (S.D.N.Y. 2001), *aff'd*, 7 Fed. Appx. 94 (2d Cir. April 3, 2001) (since plaintiff could not introduce evidence that suggested

---

[3]  This analysis also applies to plaintiff's ADA claim.  Even if the court were to assume that plaintiff had established a disability for purposes of the ADA, he has not shown that his employer knew of his disability and discriminated against him based on that disability.

defendants were aware of his past alcoholism, he was unable to prove that his disability was the cause of the adverse employment action); *Barnett v. Revere Smelting & Refining Corp.*, 67 F. Supp. 2d 378, 392 (S.D.N.Y.1999) ("At a minimum, for there to be causation, the employer must have knowledge of the disability."). In *Kolivas v. Credit Agricole*, the employee was alleged to have acted in an unprofessional and offensive manner when given his performance evaluation, and the employer decided to terminate him. The employer subsequently learned that the employee had seen a psychiatrist and been medicated for depression. Because the employer did not learn of the diagnosis until after it decided to terminate the employee, the employee failed to establish that he was discharged because of a disability. *See Kolivas v. Credit Agricole*, 1996 WL 684167, at *4. Here, plaintiff's supervisors were unaware that plaintiff had been diagnosed and was being treated for depression. The employer cannot be expected to infer a disability for purposes of the NYSHRL or the ADA on the basis of plaintiff's personal problems and performance deficits. Accordingly, plaintiff has failed to establish a *prima facie* case of discrimination under either the ADA or the NYSHRL.

Finally, even if plaintiff was able to establish a *prima facie* case of discrimination under either the ADA or the NYSHRL, defendant has set forth legitimate non-discriminatory reasons for plaintiff's discharge. Ron Benham, President of DEM, testified that he made the decision to discharge both plaintiff and Sharp at a management meeting in Florida in January 1996. Benham Dep., pp. 63-65. Mr. Benham stated that the working relationship between plaintiff and Sharp had become "dysfunctional," and the inaccurate 5Q forecast was "the straw that broke the camel's back." *Id.,* pp. 66-67. Additionally, plaintiff's

performance problems are well documented–specifically, his strained relationship with Sharp.  Thus, defendant has sustained its burden under the *McDonnell Douglas* analysis. The burden then shifts to plaintiff to show that the proffered reasons were pretextual and plaintiff was discharged based on his depression.

Plaintiff's attempts to portray the reasons for his discharge as a pretext for discrimination are unavailing.  He argues that his superiors, knowing that he had suffered personal problems, put him under stress at a busy time of year when he planned to be out of the office for carpal tunnel surgery.  However, the record indicates that plaintiff was given additional time to complete his action plan when he advised his superiors of the upcoming surgeries.  Additionally, he argues that his superiors wanted to discharge him before he could address his performance and interpersonal problems.  Benham stated that he was aware that plaintiff was in the midst of formulating an action plan, yet he felt that he needed "immediate change."  Benham Dep., p. 67.  Plaintiff has offered nothing but conclusory allegations in support of his position that the stated reasons for his discharge were a pretext for disability-related discrimination.  Accordingly, defendant's motion for summary judgment dismissing plaintiff's ADA and NYSHRL claims is GRANTED.

### B.  Reasonable Accommodations

Plaintiff's claims under the ADA and the NYSHRL, that defendant failed to provide a reasonable accommodation for his disability, must also be dismissed.  While defendant argues that plaintiff failed to assert such a claim before the EEOC, the court finds that plaintiff stated a claim for the denial of a reasonable accommodation in his administrative

charge.   Nonetheless, plaintiff has failed to establish a *prima facie* case of denial of a reasonable accommodation.

To establish a *prima facie* case of failure to provide a reasonable accommodation under the ADA, a plaintiff must show that:  (1) he has a disability protected by the statute; (2) he is otherwise qualified for his position; (3) the employer had notice of his disability; and (4) the employer refused to provide a reasonable accommodation despite such notice. *Stone v. City of Mount Vernon,* 118 F.3d 92, 96-97 (2d Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998); *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995).   Plaintiff contends that the reasonable accommodation he sought and was denied was time in which to complete and implement his action plan.

Plaintiff has not established a disability protected by the ADA.  As noted above, plaintiff's depression did not substantially limit any major life activities.  Additionally, it is undisputed that defendants were not aware of plaintiff's diagnosis and treatment for depression until after his discharge.  The record indicates that the action plan proposed by plaintiff's superiors was not an "accommodation" to address plaintiff's known mental disability, as plaintiff's superiors were unaware of his condition.  Plaintiff did not request any accommodation; he was required to prepare the plan to address certain work-related problems.  It is also undisputed that defendant accommodated plaintiff's requests for time off to attend to his personal problems and medical needs.  Plaintiff has failed to show that defendant denied any reasonable accommodation under the ADA or the NYSHRL, and the claim must be dismissed.

### C. Family and Medical Leave Act (FMLA)

Finally, plaintiff's cause of action for discrimination under the FMLA must be dismissed.  A plaintiff asserting a FMLA claim must establish *prima facie* that (1) he availed himself of a protected right under the FMLA; (2) that he was subjected to an adverse employment action; and (3) that there is a causal connection between the protected right and the adverse employment action.  *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004); *Morgan v. Hilti, Inc.* 108 F.3d 1319, 1318-319 (10th Cir. 1997); *Bond v. Sterling, Inc.,* 77 F. Supp. 2d 300, 303 (N.D.N.Y. 1999).   The FMLA makes it unlawful for any employer either "to interfere with, restrain or deny the exercise of or the attempt to exercise, any right" it grants.  29 U.S.C. § 2615(a)(1).  To succeed on a cause of action for the denial of, or interference with, benefits under the FMLA, a plaintiff must establish that: (1) he is an eligible employee under the FMLA; (2) the defendant is an employer under the FMLA, as defined in 29 U.S.C. § 2611(4); (3) he was entitled to take leave under the FMLA, as defined in 29 U.S.C. § 2612(a)(1); (4) he gave notice to the defendant of his intention to take leave, as defined in 29 U.S.C. § 2612(e)(1) and 29 C.F.R. § 825.302-.303; and (5) that he was denied benefits to which he was entitled under the FMLA.  *Santos v. Knitgoods Workers' Union, Local 155*, 1999 WL 397500, *3 (S.D.N.Y. June 15, 1999), *aff'd*, 252 F.3d 175 (2d Cir. 2001); *Bond v. Sterling, Inc.*, 77 F.Supp.2d at 306.  In analyzing such claims, courts have borrowed the framework employed in cases brought pursuant to Title VII.  *Bond*, 77 F. Supp. 2d at 303.

Plaintiff has failed to set out a *prima facie* case of interference with the FMLA in that he cannot show that he was denied any benefits under the FMLA.  Plaintiff states that

defendant interfered with his right to medical leave in that he was compelled to complete his action plan at a busy time of year and at a time when he was scheduled for carpal tunnel surgery.  However, the FMLA does not guarantee that an employer will not make inconvenient work-related demands on an employee.  It is undisputed that plaintiff took leave from his position to have surgery to address his carpal tunnel syndrome, and also took time off as a result of his personal and family problems.  Additionally, plaintiff argues that defendant interfered with his rights under the FMLA when it discharged him one day before his planned appointment with Dr. Plasse, the industrial psychologist.  Plaintiff contends that "each time that [he] . . . tried to take care of a medical issue," defendant would interfere.  Item 74, p. 23.  However, there is nothing in the record to suggest that plaintiff's scheduled appointment with Plasse was a medical appointment to address a medical need.  Thus, it cannot be said that plaintiff's discharge prior to his appointment with Plasse was an interference with his right to leave under the FMLA.  Plaintiff was never denied any time off, nor was he punished for his use of leave.  Accordingly, plaintiff's FMLA claim must be dismissed.

## 2.  Motion for an Adverse Inference

Plaintiff sought records of his interviews with Dr. William Plasse, the industrial psychologist, in support of his ADA cause of action to show that defendant was aware of his depression prior to his discharge.  Dr. Plasse has averred that he submitted copies of his reports of consultations with employees to division vice presidents.  Plaintiff states that defendant was aware that litigation was likely from February 14, 1996, but failed to retain the records in contravention of its own record retention policy.

A party seeking sanctions for spoliation of evidence has the burden of proving three elements: "(1) that the [alleged spoliator] had an obligation to preserve the evidence; (2) that the [alleged spoliator] acted culpably in destroying the evidence; and (3) that the evidence would have been relevant to [the aggrieved party's] case, in that a reasonable jury could conclude that the evidence would have been favorable to [the aggrieved party]." *Golia v. Leslie Fay Co.*, 2003 WL 21878788, *9 (S.D.N.Y. August 7, 2003); *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-08 (2d Cir. 2001); *John Street Leasehold, LLC v. Capital Mgmt. Res., L.P.*, 154 F. Supp. 2d 527, 541 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 73, (2d Cir.), *cert. denied*, 537 U.S. 883 (2002) (destruction due to gross negligence is sufficient to support finding of spoliation).  A party is not guilty of spoliation when it destroys documents as part of its regular business practices and is unaware of their potential relevance to litigation.  *Remee Prods. Corp. v. Sho-Me Power Elec. Co-op.*, 2002 WL 31323827, *8 (S.D.N.Y. October 17, 2002).

In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed.  This obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation, most commonly when suit has already been filed, providing the party responsible for the destruction with express notice.  Additionally, a party may have an obligation to preserve evidence under circumstances when it should have known that the evidence may be relevant to future litigation.  *Kronisch v. United States*, 150 F.3d 112, 126-27 (2d Cir. 1998).

Here, plaintiff has failed to sustain his burden in seeking the adverse inference.  He has offered no proof that any of Dr. Plasse's records were lost or destroyed after February 14, 1996, when plaintiff argues that Dexter should have been on notice of the impending litigation.  Plaintiff has offered proof that records may have been purged in the ordinary course of business at the end of 1994 (Item 83, Exh. 14), but has offered no proof that plaintiff met with Dr. Plasse after that time.  Additionally, there is no proof of an intentional or bad faith destruction of documents.  Finally, plaintiff has offered no proof that Dr. Plasse was aware of plaintiff's depression, or that any of his reports would include information regarding plaintiff's depression.  Plaintiff has not indicated the dates of his consultations with Dr. Plasse, nor any proof that these consultations occurred after plaintiff began having personal problems or was treated for depression.  Significantly, plaintiff does not state that he discussed personal problems with Dr. Plasse, or divulged his diagnosis of depression.  According to Dr. Plasse, he reviewed his report with the employee and sent a copy to the employee's division Vice President.  If any of the reports contained relevant information, plaintiff would be aware of it and could offer proof of such relevance to the court, but he has not.  Accordingly, plaintiff has failed to establish that any such evidence would be relevant on the issue of defendant's knowledge of plaintiff's depression, and the motion for an adverse inference is DENIED.

## 3.  Motion to Amend the Complaint

Finally, plaintiff seeks permission to amend the complaint.  He states that the purpose of the amendment is "simply to clarify the plaintiff's claims based on the facts that have arisen during the lengthy period of discovery."  Item 88, Exh. 2 (Liebers Affidavit), ¶ 4.

Defendant opposes the motion, arguing that plaintiff has not provided a satisfactory explanation for his failure to raise the claims earlier, that defendant will be prejudiced by the amendment, and that amendment will be futile.  The new causes of action sought be added include:  a discrimination claim based on "perceived disability" under the ADA and the NYSHRL, retaliation clams under the ADA, NYSHRL, and FMLA, and a hostile work environment claim under the ADA and NYSHRL.

Rule 15(a) of the Federal Rules of Civil Procedure provides that after a responsive pleading is served, a plaintiff may amend the complaint "only by leave of court or by written consent of the adverse party . . . ."  Fed.R.Civ. P. 15(a).  Under Rule 15(a), leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  A motion to amend should be denied, however, "if there is an 'apparent or declared reason–such as undue delay, bad faith or dilatory motive . . .  repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.'"  *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (citation omitted) (A "motion to amend should be denied only for such reasons as 'undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.'").  The decision whether to grant leave to amend is within the sound discretion of the court. *See Foman*, 371 U.S. at 182.

Mere delay, absent a showing of bad faith or undue prejudice, does not provide a basis for denying a motion to amend.  *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d

Cir. 1993) (quoting *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).   In determining whether a party's interests will be unduly prejudiced by an amendment, courts generally consider "whether the assertion of the new claim . . . would: '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction,'" *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir.) (quoting *Block*, 988 F.2d at 350), *cert. denied,* 531 U.S. 1035 (2000), with more emphasis on the first two considerations.   *See, e.g., E.E.O.C. v. Morgan Stanley & Co.,* 211 F.R.D. 225, 227 (S.D.N.Y. 2002); *Tokio Marine & Fire Ins. Co. Ltd. v. Employers Ins. of Wausau*, 786 F.2d 101, 103 (2d Cir. 1986).

Although there is a general presumption in favor of permitting amendment, the court has broad discretion in deciding whether to allow plaintiff to amend his pleadings.   Leave to amend may be denied where it appears that the proposed amendments are "unlikely to be productive . . . ."   *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *see also Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir. 1984) ("That the amendments would not serve any purpose is a valid ground to deny a motion for leave to amend.").   Thus, if the proposed amended complaint would be subject to "immediate dismissal" for failure to state a claim or on some other ground, the court will not permit the amendment.   *Jones v. New York State Div. of Military and Naval Affairs*, 166 F.3d 45, 55 (2d Cir. 1999).   By contrast, if plaintiff has at least colorable grounds for relief, justice requires that the motion to amend be granted.   *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984).

Here, plaintiff moved to amend the complaint in March 2004, six and one-half years after the commencement of the action, two and one-half years after he changed attorneys, one year after the close of discovery, six months after defendant filed its motion for summary judgment, and two months after plaintiff responded to the motion for summary judgment.   Plaintiff explains the delay in asserting the additional claims by citing the bankruptcy proceedings, his change in counsel, and the complexity of the case and the law.   While the bankruptcy stayed proceedings in this case, the delay in bringing this motion is not otherwise satisfactorily explained.   The court notes that plaintiff's current attorney filed his notice of appearance on October 19, 2001 (Item 56), and the salient facts and circumstances of the proposed claims were known at the time of the filing of the original complaint.   The additional discovery required to defend these additional claims, while not alone a sufficient reason to deny a motion for leave to amend, will result in prejudice to the defendant.

The most compelling basis for denial of the motion is futility.   None of plaintiff's claims would survive a motion to dismiss.   In cases claiming perceived disability under the ADA, a court must first determine whether a plaintiff was viewed or was recorded as having an impairment.   Second, it must determine whether that impairment, as perceived or recorded, affects a "major life activity" as the ADA defines that term.   Finally, the court must consider whether plaintiff's perceived or recorded disability is one that, if it existed, would substantially limit the identified major life activity. *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998), *cert. denied,* 526 U.S. 1018 (1999); *Bater v. Kraft Foods Inc.,* 2005 WL 602383, *6 (W.D.N.Y.   March 14, 2005).   This third requirement ensures that only significant impairments (and perceptions and records thereof) are

25

covered by the ADA.  *Colwell,* 158 F.3d at 642.  As  noted above, the NYSHRL employs

a broader definition of disability, but plaintiff nonetheless cannot show that defendant

regarded him as disabled under either statute.   It is undisputed that none of plaintiff's

superiors knew that he had been diagnosed with and was being treated for depression.

Further, plaintiff stated in his deposition that he did not expect his superiors to have

concluded that he was depressed. There is no proof that plaintiff's superiors regarded him

as suffering from either a demonstrable disability under the NYSHRL or a disability that

affected a major life activity as required by the ADA.   Accordingly, allowing plaintiff to

amend his complaint to add claims under the ADA and NYSHRL for "perceived" disability

would be futile.

Plaintiff also seeks to assert a claim that defendant discriminated against him by

subjecting him to a hostile work environment based upon his disability. Although the

Second Circuit has not determined whether the ADA gives rise to a cause of action for

hostile work environments, *see Bonura v. Sears Roebuck & Co.*, 62 Fed. Appx. 399, 400

n.3 (2d Cir.  2003), *cert. denied,* 540 U.S. 1113 (2004), several other circuit courts and

several district courts in this circuit have held that such claims are cognizable.  *See, e.g.,*

*Fox v. General Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001); *Flowers v. Southern Reg'l*

*Physician Servs. Inc.*, 247 F.3d 229, 232-35 (5th Cir. 2001);  *Hendler v. Intelecom USA,*

*Inc.*, 963 F. Supp. 200, 208 (E.D.N.Y. 1997) (analyzing ADA hostile work environment

claim under the same standard as in Title VII);  *Hudson v. Loretex Corp.*, 1997 WL 159282,

at *2-3 (N.D.N.Y. April 2, 1997).  It is unnecessary to reach this issue because the court

finds that plaintiff would not be able to establish a *prima facie* case of hostile work

environment under the standards utilized in Title VII cases, and this claim would not survive a motion for summary judgment.

A work environment is hostile "'[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Torres v. Pisano*, 116 F.3d 625, 630-31 (2d Cir.) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), *cert. denied,* 522 U.S. 997 (1997). When analyzing a hostile work environment claim, courts should consider the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767-68 (2d Cir. 1998) (quoting *Harris*, 510 U.S. at 23). Generally, isolated incidents of harassment do not give rise to a hostile work environment claim; instead, the incidents must be "sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted).

Here, the conduct alleged by plaintiff is not so severe or pervasive as to have altered his working conditions. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (noting the Supreme Court's desire to set the standards for a viable hostile work environment claim sufficiently high to prevent converting Title VII into a "general civility code" for the workplace). In his proposed amended complaint, plaintiff states that he was not given sufficient time to implement his action plan, he was expected to present the plan at a time when he was scheduled for surgery, and then he was discharged before he could meet with the industrial psychologist. These incidents are not

27

sufficient to meet the standard for an actionable claim of hostile work environment based upon disability.  Plaintiff asked for and was allowed additional time to complete the action plan due to his scheduled carpal tunnel surgery.   Moreover, the timing of his discharge, while unfortunate, does not constitute "discriminatory intimidation, ridicule, and insult." *Torres v. Pisano*, 116 F.3d at 630-31.  The alleged conduct is not "so severe or egregious" as to alter the terms and conditions of plaintiff's employment.  Accordingly, the claim would not survive a motion to dismiss, and the motion to amend the complaint to add this claim would be futile.

Finally, plaintiff seeks to add claims for retaliation under the ADA, NYSHRL, and FMLA, stating that he was not provided severance pay, outplacement services, or references in retaliation for bringing his EEOC charge.  To establish a *prima facie* case of retaliation under the ADA, NYSHRL, and FMLA, plaintiff must establish:  (1) participation in a protected activity known to the defendant; (2) an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996), *cert. denied,* 520 U.S. 1228 (1997).  Proof of causal connection can be established:  1) indirectly by showing that the protected activity was followed closely by discriminatory treatment; 2) indirectly through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or 3) directly through evidence of retaliatory animus directed against a plaintiff by the defendant. *DeCintio v. Westchester County Medical Ctr.*, 821 F.2d 111, 155 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987).

Here, plaintiff is unable to establish a *prima facie* case of retaliation.  While he engaged in protected activity–*i.e.*,  the filing of an administrative charge with the EEOC, the charge was filed in October 1996, months after he was denied severance pay and outplacement services.  Thus, it cannot be said that defendant retaliated against plaintiff by withholding severance pay and other benefits as a result of his protected activity.  The requisite causal connection for retaliation claims may be established only if the protected activity preceded the claimed retaliation.  *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980); *Cronin v. ITT Corp.*, 737 F. Supp. 224, 230 (S.D.N.Y. 1990).

Additionally, the payment of severance pay and provision of outplacement counseling services was contingent on plaintiff's agreement to sign a release of claims, which plaintiff refused to sign.  As plaintiff was not otherwise entitled to receive severance pay and benefits, the award of severance pay and benefits was a privilege rather than a right.  *See Jackson v. Lyons Falls Pulp & Paper, Inc*., 865 F. Supp. 87, 95 (N.D.N.Y. 1994).  As such, defendant's refusal to grant plaintiff severance pay and benefits cannot be characterized as an adverse action.  Instead, defendant merely declined to enlarge plaintiff's rights to compensation.  Such a decision does not form the basis of a retaliation claim.  *Id.; Cronin v. ITT Corp.*, 737 F. Supp. at 231 (granting summary judgment on retaliation claim where defendant's refusal to pay severance to which plaintiff not legally entitled was based on plaintiff's refusal to sign a release).  Finally, the record indicates that it was the defendant's policy not to provide references to a discharged employee. *See* Deposition of Donald Christiansen, p. 57.  Plaintiff cannot show that defendant treated him differently than any other discharged employee, and cannot show that the denial of a

reference was in retaliation for his participation in protected activity.  Accordingly, plaintiff's retaliation claims would be futile.

As amendment of the complaint would be futile, the motion for leave to amend is DENIED.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (Item 66) is GRANTED, plaintiff's motion for an adverse inference (Item 83) is DENIED, plaintiff's motion to amend the complaint (Item 88) is DENIED, and the complaint is dismissed.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated: April 3    , 2006
p:\pending\1997\97-763.mar706

30